So we will hear argument next in case number 24-1201, EscapeX IP against Google. Whenever you're ready, Mr. Ramey. Good morning, Your Honors. Bill Ramey for Appellate and EscapeX IP. If it pleases the Court, may I begin? EscapeX seeks reversal of a sanction under Section 285 and a sanction under Section 1927. But before I get into my argument, I wanted to kind of frame the appeal. I think it's appropriate. We are only here today because another court found the claims of the 113 patent ineligible at the 12B6 stage on January 24, 2023. And after deciding not to appeal, EscapeX could only get Google to dismiss this case if it dismissed with prejudice. That allowed Google to file its Section 285 motion. Prior to that, Google did not file a motion to dismiss whether under patent eligibility or otherwise for failure to state a claim. Rather, Google answered the second amended complaint on October 17, 2022. After Google answered, EscapeX was ready to test the merits of its claim. However, the finding in New York changed that. Within a few short weeks after deciding not to appeal after that month that we looked at the matter and decided not to come to this course acting for a reversal, that dismissal, EscapeX sought to dismiss the case. I think, though, it's pretty selective to say that's the only reason we're here. You had a pattern of not being responsive to Google in this case. They reached out to you about whether the case was in the right court or should be transferred. No response. They pointed out things that they thought were incorrect in your complaint, seemingly showing a lack of any diligence and pre-suit investigation, which they couldn't put in a 12B6 because they had to accept as true what you alleged, even though evidently they knew and thought you should know it's not true. No response. Aren't those the beginnings of why we're here? Your Honor, I actually don't think so. I think we were responsive. We amended our complaint twice. This is the second minute complaint they answered. Did you respond to their inquiries about whether you thought you were in the right venue? I personally had, whether they were in the right venue, it was based on convenience is what they were transferring. Was there any response? Yes, we'd actually talked to them originally about that briefly, and I did have a conversation with Mr. Banner myself. So when they suggest to us that there was no response whatsoever, that's incorrect? That's incorrect. There was constant communications back and forth. We didn't write a formal response on the motion to transfer. We looked at the matter at that point, Your Honor, and said the expense in fighting it was too much. We were thinking we probably would lose on the motion to transfer. There were, I think, 24 exhibits with it. And so we decided just not to oppose it. And then we actually filed, I can't remember the exact date, but I think it was 16 or 17 days after they filed the motion to transfer, a notice of non-opposition. So we have a formal comment. When they point out that it seems you've done no pre-suit investigation because you don't understand their products and the timing of when they were released, did you respond to that? Yes, we amended the complaint for a response for that, and we actually have put that forward. That's in, Your Honor, if you would look at the appendix. I'm familiar with the amended complaint, but was there any informal response to indicate that you were considering what they were raising with you? Just in brief phone conversations with Mr. Banner, that's all we had. We didn't do any substantive response at that time. We merely went and amended our complaints. Well, I guess the issue that we see with the infringement allegations, it's kind of like if you have a shift on the fly for a four-wheel drive. Four-wheel drives have existed for a long time on cars, just like auto ad may have existed for a long time with Google's product, the YouTube music product. But when they added that artist-specific application, that was what we didn't find up until after the priority date for the 113 patent. That's what we added in to our infringement allegations in the second amended complaint to make sure that that was very clear. And if the actual appendix, Your Honor, sorry, it points out and was submitted by Google, our diligence on this exact point, at appendix 0235 through 0236, when we showed that the auto ad features when it started and when it ended, what we could find with the Wayback Machine. So we put exactly into our amended complaint what we alleged was when the Wayback Machine said the auto ad feature with the features we were accusing of infringing existed. We have that. Actually, it starts on 0233, and then it goes into the, right on the next page, 0235. We talk about how we're just, how we're showing when that was added, and then when it ended, when it stopped. So it was there for six years. Can you just, I think I would like to understand this better. What are you saying that this shows? Yes, Your Honor. So if you look at, pardon me, if you look at 0235, Your Honor, what we did here is because one of the allegations by Google was that, oh, auto ad existed before the priority date of the 113 patent. So we, our technical resources went back and they went to the Wayback Machine. And the earliest point where we could find an artist-specific application for the auto ad feature was shown on this slide, 0235. I'm sorry, where does it say this is the earliest we could find? Okay, I'm sorry, 0234. It says start of auto ad feature. My apologies, Your Honor. Didn't you see that on the red? This is not in color. This is not in color, so. Okay, my apologies, Your Honor. It says Google's YouTube video. Yeah, and I see start of auto ad feature. I don't know who wrote those words, where they come from, what's behind them. Okay, these are in our infringement contingents that we submitted to them. So this is what we're alleging proves our case. This is what we're saying is these are allegations of infringement that we submitted to them. If we go back, Your Honor, and we look. So we're supposed to understand this start of auto ad feature, this phrase means that you think this is where, was it, this is the earliest you could find? Yes, Your Honor, that was in our infringement contingents. These, if you go back to 0214, that you can see this is what this is, our infringement contingents. We were actually just then looking at claim 14. We've actually done the same thing for claim 1. So this is how we tried to address it. That's at appendix 022. And there, if you go to appendix 0221, Your Honors, it says timeline analysis. And so that's where we start our timeline analysis of when the auto ad feature was added that we could find. And that's how we put this into our infringement contingents to try to give evidence to Google that we had looked at this issue, Your Honor. But overall, if I could go back to the argument, I think if we go to looking to the Parkin Theaters versus Perkins test, it was cited by Octane Fitness. We're looking for bad faith or some sort of grossly unfairness in here. And we just don't find in this case, this is a case that existed for a few short months on the docket. It was only dismissed because a court in New York, Judge Furman, found the patent invalid under 101. And after we looked at it, we dismissed the case with Google. And then they filed the motion for fees. Talk about that because the record seems pretty clear. You dismissed, represented to the district court that you had their consent, that they wouldn't seek fees, and that was all false. So that's an interesting point. And I've gone back and talked to my, our California counsel did file that. So that was a communication from another attorney in my office, Jeff Kubiak, with Mr. Barron. And he came to the agreement that the case was going to be dismissed. He thought he had the agreement of Mr. Barron to dismiss with prejudice. And that was a simple mistake. I can't find anything other than that. He swears to this day that he had an agreement to dismiss with prejudice. Why not explain that to the district court when you filed the supplemental stipulation of dismissal? Pardon me? I'm sorry. You filed a supplemental dismissal stipulation without explaining what the error was in the first one. The error being that you represented something that was not true. Why not explain that to the district court at that time? In retrospect, I think we would. But it was just that we were trying to get it done quickly because Mr. Barron had contacted us from Google's attorney and had said that they needed the case dismissed because they were going to start incurring fees. I think it was, they had to prepare for some motion or something about seven or eight days later. So that was the onus for us to get the case dismissed. It wasn't done with anything intentional. It was within a day that Ms. Kalra had filed the corrected notice of dismissal. It was an accident, a pure accident. When it came time for the fees motion, the first fees motion, the 285 fees motion, what did you say in response to the arguments made by Google for why this was exceptional? I'm going to start at what, to my mind, is the very, very small thing of the stipulation. First, what did you say about that? That was a mistaken stipulation. Did you say in your response to the 285, I'm not interested at the moment in anything that happened before the 285 motion, okay? So now I'm just talking about they file a 285 motion, you file a response. Remind me, please, what you said about, and I'm sorry, I do want to ask about the stipulation question, but not because I think it's the big deal. I just wanted an answer to the question. What did you say about the mistaken stipulation? We submitted, Ms. Kalra submitted a declaration explaining that it was a mistake. Okay. Now, on the big issue, pre-suit investigation. Yes, sir. What did you say about the pre-suit investigation in the 285 response, not later? Our 285 response was limited, showing that our infringement claims showed that the auto-add feature was not added, was added after the priority date for the 113 patent. The auto-add feature, we were accused of infringing. So we were tied to infringement, which necessarily included validity because if it were pre-dated. Can you show me where in your opposition to the 285 motion you provided some evidence or argument about how the auto-add feature changed between the 2014 priority date and later? Yes, Your Honor, the, one second. Your Honor, during the break, I'll get you that exact slide of where it came from in the record. I don't have it with me right now. I mean, just so you know how I'm thinking about it right now, this seems to me the crucial issue that you later, in response to the motion, no, I'm sorry, in filing your motion to amend the judgment, put in some new evidence, right? Two declarations, one of your CEO and one of the technical resource. That was not in front of the judge at the time the judge was deciding the 285 issue. And I want to understand what was in front of the judge on the 285 motion on the crucial question of pre-suit investigation. And it was issues about infringement, Your Honor, and I don't have the site to the motion right now, but I can get that from the record. I'm sorry. I'm in my rebuttal. If you don't mind, I'd like to just touch one thing real quick, and then I'll sit down, Your Honor, and just touch briefly on the 1927 sanctions. And I would just like to say that for a section 1927 sanction to be appropriate in California, the Ninth Circuit, it doesn't just have to be reckless. It has to be reckless, and then it has to be the, shoot, what am I trying to say? It has to be frivolous. The judge did find reckless. I'll give you that, but there was no frivolous finding. We know from the Caputo v. Tungsten, 96, Fed 4th, 1111, it tells us at page 1155 that for frivolous arguments for the purpose of 1927 sanctions are ones that are baseless and made without reasonable and competent inquiry, are made above legal and factual contentions so weak as to constitute... The 1927 finding relates to your 59E motion, correct? Yes, Your Honor. How could it be anything other than frivolous to claim that these declarations are newly discovered evidence? And, Your Honor, I can get that in my rebuttal when I get back, but I cited it in the brief. Okay, yes, Your Honor. So, as we cited in our brief, the Ninth Circuit has used the test of new evidence committed clear or initially or manifestly unjust or intervening changes in control of the law. And then Google's own letter cited the case that said there may be other highly unusual circumstances... Reconsideration. I understood your argument in the 59E, but correct me if I'm wrong, was, hey, Judge, we have newly discovered evidence. Was that not the grounds that you contended allowed you to move under 59E? That was, it was manifestly unjust and newly discovered evidence. Where did you say manifestly unjust in your opposition? I think we cited the case law that said it. I'm not sure that we specifically pointed that out, but this is what we were moving under from their own letter that they sent us. How could it be newly discovered evidence? It was declarations from your own client and maybe an employee. Yes, Your Honor. Going back to the standard for the, how you can do a section 1927, that those were made with competent inquiry. The judge did deny the 59E. That doesn't make it sanctionable to counsel. Well, but how, the question, though, is this. I mean, obviously you can't say it was newly discovered because you're saying that it existed because it was before the suit was filed. So it seems like it's a very difficult question to answer, but you need to answer it. Yes, Your Honor. How could it be newly discovered? It was newly discovered. We haven't, we didn't have, hadn't developed that evidence to give to the court. We hadn't developed it. And that's, that's what we meant by that. That's a. You didn't have the, you had not yet taken the time to get the declaration statements. That's, well, we went from the root, we went from the root of attacking it from, we looked at the infringement point of view, identify from the technical resource that the auto-add feature wasn't added until after the priority date for the 113 patent. That's how we made sure that we had a valid infringement claim under VIEW Engineering to have satisfied our Rule 11 basis. That's how we went. I think I'm over my time. Can I come back and say a quick two-minute rebuttal after this? Yes. Thank you very much, Your Honor. Your Honor, may it please the Court, Jonathan Tietz for Google. With me is Dan Bagatelle, co-counsel. I want to start by just addressing three points in a reply brief that we didn't get to address in briefing. The first of them is a statement by EscapeX that we admitted that there was a pre-priority date product and a post-priority date product and that the features differed. I don't think there's any reasonable way to read our brief to say that. What's the second point? Clearly. What's that? What's the second point? The second point is there's a new statement that the YouTube Music was discontinued and rebranded as YouTube Video. That's not true. In fact, the original URL in the first set in the mix and match theory of contentions, that URL still works. They're separate products and they do separate things. What's the third point? The third point is the argument that they didn't waive the Manifest in Justice argument. I don't think I need to belabor that. But even in the reply brief, they only cite what they said in the 1927 briefing. Those are the three points I wanted to address. So can you get to, I think what I, at least I'm interested in something Mr. Ramey said about the preliminary, or the infringement contentions, what was it, at 235, 216, what were the pages? 234 to 236, that's just the range. Right, so this was, I'm sorry, was this attached to the second amended complaint? No, these were infringement contentions. Okay, the chart is the same as the chart that was attached to the second amended complaint, that's true. The start of auto-add feature, that part is different, that new comment is different. I think an important context bit to note here is that these are infringement contentions that were served in October, so it was actually before Google's letter saying, look, auto-add predates. Here's what I'm trying to get at. It seems to me the core of this, the core of what actually seems strong is the pre-suit investigation point. And I'm trying to understand whether there were, before the motion to amend proceeding, whether there were arguments or evidence asserted that we had reason to think that the accused auto-add feature post-dated the priority date and therefore would not invalidate the patent if, yes. Absolutely not. So what about this? This is the start of the auto-add feature itself. I'm sorry? That's their assertion that that's the start of the auto-add feature itself, but Google had shown that, in fact, the feature was far before this date, it was at least a year before. I guess just trying to understand this language, start of auto-add feature. This is not start of a feature in auto-add or start of auto-add, parenthesis, which is the feature as a unitary thing, which is obviously a very different position. That would be the second one, Your Honor, the feature itself, auto-add as itself. This URL, there's a screenshot from it on the next page, and this is YouTube's guide to how to use auto-add as a whole when managing a playlist. So this could not be understood as asserting that there was a artist-specific feature within auto-add that this date in 2015 was the start of? There's no reasonable way to understand this argument to mean that. Well, why is that? Why is that? In addition to the point that ScapeX didn't argue that at Appendix 433 or 429, which are the relevant parts of the 285 briefing, what they say in Appendix 234, 235, and 236 itself just relates to playlists as a whole. It doesn't say anything about artist-specific application. It's just about this feature as a whole. In fact, if you turn back, Your Honor, to the claim chart that precedes this, that's at Appendix 230 for Claim 27, for instance, the claim mapping is pretty much the same across the patents. This auto-add feature that they're pointing to corresponds to the same screenshot is present in a limitation on Appendix 231, for instance. It talks about one or more commands that specify a change, etc. A whole broader set of things than this narrow artist-specific application feature that they're focusing on now on appeal. If they had made the argument below, it would have been easy to rebut, and I think it also would have been in the judge's discretion to address it. I want to respond to just five quick points that the counsel made. The first is about this conversation about the transfer motion. I think the important point there, the first important point is that there's nothing in this record and nothing was said about that in response at 285. But the other point is, I think I heard counsel said, and forgive me if I'm wrong, that EscapeX noted it's non-opposition to transfer. It was Google that noted EscapeX is not opposition once the deadline had come and passed. The other point I want to respond to... Were the fees that were awarded, did the fees that were awarded include fees for work done on the transfer motion? I believe they did as part of the whole exceptional case. That's a question of the fee amount, of course, and that's not an issue on appeal, the fee amount anymore. The other point I want to respond to was that... I don't remember this part. The district court gave you substantially less than you asked for, right? Yes. Did the district judge say, he must have said, here are the parts that I'm not going to give you? I should go for it. Google got a haircut on the 1927 award. On a 285 award, the district judge found the amount facially very reasonable and even thought that we were effectively showing mercy, so the amount was reasonable. I think 285 is everything, and presumably, I mean, you don't happen to remember whether you asked for fees on the work in preparing the transfer motion? I don't happen to remember. I don't think it's... It's certainly not in the appendix. And would any of that... I'm sorry, this stuff matters to me, so would any of that work have been not... Unnecessary if after... If they had agreed to the transfer earlier? Certainly some of that work... I assume most of the work for the transfer motion went into preparing the motion itself. Preparing the motion and supporting evidence to it. Yes, because there could have been a stipulation. There could have been a voluntary dismissal and refiling. So delay in responding to the motion, essentially all of the work on the transfer motion has been done by then. Yes. So is there a finding that the transfer was... The filing of the original form was itself unreasonable? I don't think... No, there was not a finding on that. Okay. And actually, I should clarify that not all the work had been done by the point of non-opposition, because the transfer point had been raised, for instance, in Google's November 7th letter, and it was previewed, and EscapeX, I've heard say, had a conversation about this. So there were points at which, given the clearly more convenient Northern District of California venue in this case, that additional work could have been adverted, but was not. And there was simply... There was not a position taken, as is clear in this record. So would the timeline show that Google contacted EscapeX about transferring venue before you had completed work on your motion to transfer? That is more in the weeds than I know. You're not sure what the record shows on that. Well, the record, I believe, shows that that transfer happened. Now, I'm just saying EscapeX has alluded to additional things that are not in this record, and so that's my... Right. And one was the brief phone responses. I think you've just told us there's no record? Yes, there's no record of that. How about this? I think it was suggested today that they did get consent to file the stipulation of dismissal. Is there anything in the record on that? There's nothing in the record of that, Your Honor, at all. And then that would have been a prime thing to have said, but I think that still wouldn't have gone far enough because it doesn't address why Kate Lazarus's signature would have been addressed. But I think the important point is not in the record. Why, if at all, is it important that the stipulation of dismissal was filed without consent from Google? Well, for one thing, it misrepresents to the public what Google is willing to agree and in what circumstances it caused more work because Google had to reach out and ask for this to be withdrawn. And to ask that it be withdrawn with an explanation to say this isn't something that Google said and then changed its own mind on, which the simple withdrawal leaves open. So it increased the work, and then it also, of course, implicates the duty of candor to the court before the Northern District of California. The other point I want to just address is this first shred of defense of the newly discovered evidence standard and evidence wasn't developed. There's a case that's pretty close to this, actually, in the case decided among the parties, and that's Coastal Transfer. That's a case from 1987 in which a similar claim was made about, oh, the evidence that the expert relied on wasn't developed until after. That was a frivolous argument then, and it was frivolous to insist that it was newly discovered evidence on appeal. And is that authority that you pointed out to Scapex when they filed the 59E motion? There was some informal communication in the record on that motion, I think. It's cited in the authorities. It says the same thing as school district number 1J, which was the case that we cited in the letter to Scapex and that the district court relied on, and it follows the logic of Exxon, footnote 5, which was also cited in the letter to Scapex and which the district court relied on. And you gave a supplemental authority about another district court sanctioned decision related to the same firm, I believe. What, if any, is the significance of that supplemental development? The primary point of the supplemental authority letter, Your Honor, is to the line of notion that this case is unusual in the district court's approach. Other district courts are following the same approach in other circuits under similar circumstances, and that's the main thing. That case doesn't involve the same patents. As this case, it does happen to involve the same parties. Thank you. Can I just understand a little bit better the, I don't know, the insufficiency of pre-suit investigation essentially is the basis for saying the suit was quite irresponsibly filed. Does that depend, and I don't remember, just tell me whether the district court said the basis for my finding this irresponsible filing is that if you had done a pre-suit investigation, you would have discovered that the thing you accused had priority. Or was it independently that the thing you accused just cannot conceivably be viewed as artist-specific? What the district court said is that a basic online search would have revealed that this feature did predate. So it was a simple set of steps. This actually parallels Thermalife, I think, except it's a little bit easier of a pre-suit investigation that would have had to have been done than in the Thermalife case that the parties rely on. Because that case said, you know, you could have easily tested these products and you would have known upon testing that these claim limitations would have been met. This, the district court concludes, a basic online search would have revealed that this feature, the one that you accused, predate the patent. So, I mean, which, so I thought I was remembering correctly that the basis for this was an irresponsibly filed lawsuit was that if you had done an investigation, you would have discovered that the thing you accused had priority, which places, to my mind, right at the center of this, this question of interpreting this start of auto ad feature in the, in the, the allegations. Did the district court explore that? Did the other side in responding to 285 point to this and say, um, what we meant here was, you know, that we looked and found that the earliest appearance of a particular feature inside auto ad was post-priority. No, Your Honor. They did not say that. And I think probably the reason why is when they later did explain what they had done, uh, the story there from their witnesses was that, well, we knew that the feature predated. So there would have been. I think you probably understand by now that it is incredibly important to my thinking on this what one means by feature. So if, when you just use the word, did you mean feature equals auto ad? Yes. That's obviously not what I'm interested in. Okay. They say there was a feature that appeared in auto ad after the priority. They are a specific application. That simply didn't come up.  And that, they don't say in later in the two, in the Rule 59e briefing, but that certainly did not come up at 285. Okay. If there's no further questions, I would ask that the court affirm. Okay. Briefly, Judge Stark, you had asked me for support. I apologize. It was right in front of me. I didn't get it out before. When we brought this up, if you go to Appendix 0427 through 0429, we do, in fact, in the response to the motion for fees, bring up that it is this artist-specific application we're looking for. And that's specifically Appendix 0428. So quite in contrast to what you just heard from my colleague on the other side, this was our point of differentiation. Right in the middle of the paragraph, it's, pardon me, Californians, we have line numbers. That's line 17 through 20 of that page. I'm sorry. Did you say 0248? I'm sorry. If I did, I'm in 0428, Your Honor. Oh, 0428. I'm sorry. If I said 0248, I apologize. But I'm in 0428. And which lines on page 428 do you want us to look at? 15 through 20. But it's right there towards the end. It says, Google argues elsewhere that YouTube is not an artist-specific application. And that's what we were. That was our point of differentiation. So they recognize, even at that time, that that was our point of differentiation. So for them to say that we didn't talk about that at all, that's the whole point. But that was our diligence. That's what we say did not exist until after the priority date for the 113 patent. And I will say that the briefing did point to new evidence. But we cited to the case that Google has cited to us in the letter. We were trying to say that the circumstances of how this appeal came about, that the district court judge, that all the findings are made in the motion for fees stage rather than in the merits stage. That the consensual was filed. And that the Ninth Circuit, under the Keegan case, doesn't allow 1927 sanctions on initial pleadings. That we were trying to say these were all the circumstances that were odd that would allow us to file a motion to modify the judgment. It's specifically, they're listed in the briefing. I don't know how to go through them. I apologize for that. But thank you very much for your time. Thank you. Thanks to all counsel. Case is submitted.